

# In the Court of Criminal Appeals of Texas

No. PD-0669-23

AARON RAYSHAN WELLS, *Appellant*

v.

THE STATE OF TEXAS

On Appellant's Petition for Discretionary Review
From the Fifth Court of Appeals
Dallas County

YEARY, J., announced the judgment of the Court and filed an opinion in which KEEL, FINLEY, and PARKER, JJ., joined. FINLEY, J., filed a concurring opinion in which PARKER, J., joined. NEWELL, J., filed a concurring and dissenting opinion in which RICHARDSON and WALKER, JJ., joined. MCCLURE, J., dissented. SCHENCK, P.J., did not participate.

This case involves a question about the constitutionality of a

"geofence" warrant.[1] We conclude that use of the geofence warrant in this case to obtain location history data did not violate the Fourth Amendment of the United States Constitution.[2] Accordingly, the judgment of the court of appeals is affirmed.

## I. THE OFFENSE

Jimmy Giddings was a drug dealer. He lived with his girlfriend, Nikita Dickerson, at a house at 4923 Veterans Drive in Dallas, across the street from Carver Heights Baptist Church. Dickerson and Giddings had a routine. When he returned home in the early morning hours, she would unlock the gate at their front door and greet him in the driveway. She would carry a .40 caliber Glock pistol because, while they lived in a nice house, she felt the neighborhood was unsafe.

At around 3 a.m. on the morning of the offense, June 24, 2018,

---

[1] Succinctly put, geofence warrants have been described in this way:

> While traditional court orders permit searches related to known suspects, geofence warrants are issued specifically because a suspect cannot be identified. Law enforcement simply specifies a location and period of time, and, after judicial approval, companies conduct sweeping searches of their location databases and provide a list of cell phones and affiliated users found at or near a specific area during a given timeframe, both defined by law enforcement.

Note, *Geofence Warrants and the Fourth Amendment*, 134 HARV. L. REV. 2508, 2509 (May 2021).

[2] The first ground of review we granted is: "[w]hether the Court of Appeals correctly determined the legality of geofence warrants, an issue of first impression in Texas and an important question of state and federal law that has not been, but should be, settled by the Court of Criminal Appeals."

Dickerson exited the gate outside the front door, as captured on the home's front-door security camera, pursuant to her and Giddings' routine. Security cameras from the church across the street recorded four men who had been loitering in the parking lot on the far side of the church from Veteran's Drive "for some hours" before the offense. When Giddings arrived home, the four men, wearing masks over their lower faces, rushed across the street toward Giddings and Dickerson brandishing pistols and a rifle.

In the melee that followed, Dickerson sustained five non-life-threatening gunshot wounds. She also dropped her pistol, and it was retrieved by one of the masked men. At the same time, Giddings fled into the house. Two of the assailants rushed in after him, and a third assailant marched the wounded Dickerson into the house at gunpoint. The fourth man, who turned out to be Appellant, quickly followed them.

All the men except for Appellant had visibly distinctive tattoos. Once inside, during the robbery, one of the assailants—the record does not definitively establish which one—shot Giddings in the neck, severing his spine. As a result of this gunshot wound, Giddings died.

Afterwards, the assailants fled back across the street to their vehicle in the church parking lot and drove off. As described by the court of appeals:

> Based on the security camera recording timestamp and footage showing that the men were in the area of the church immediately before and after the offense, [police] obtained a warrant to search Google's records for information on devices located within a rectangular geofence encompassing [Giddings and Dickerson's] house and the portion of the church directly across the street between 2:45 a.m. and 3:10 a.m. on June 24. Ultimately, a

cellular phone associated with [A]ppellant was identified as being at the scene. Through [A]ppellant's phone records and a search of social media, police were able to identify Milton Prentice, Brian Groom, and Kiante Watkins as the other three men involved in the offense.

*Wells*, 675 S.W.3d at 819. Watkins testified as an accomplice witness against Appellant at trial, describing the robbery in some detail.

Appellant was charged with and convicted of the capital murder—during the course of a robbery—of Jimmy Giddings. TEX. PENAL CODE § 19.03(a)(2). Because the State did not seek the death penalty, Appellant received an automatic sentence of life without parole, without the necessity of a punishment hearing. TEX. PENAL CODE § 12.31(a)(2).

## II. BACKGROUND

### A. The Geofence Warrant

The warrant at issue in this case was directed to "Google LLC[.]" It ordered Google to turn over to the police "GPS, WiFi or Bluetooth sourced location history data" corresponding to "Initial Search Parameters" generated from devices that Google's electronic records showed to have been within certain, particularly circumscribed time and location specifications.[3] The warrant required disclosure in three steps.

In Step One, the warrant commanded, "[f]or each location point within the 'Initial Search Parameters', Google shall produce anonymized

---

[3] The warrant purported to issue pursuant to former Article 18.21, Section 5A, of the Texas Code of Criminal Procedure. That statute was repealed in 2017, but the repeal was not effective until January 1, 2019. *See* Acts 2017, 85th Leg., ch. 1058, §§ 5.01(2), 6.03, pp. 4192−93, eff. Jan. 1, 2019. The warrant issued on December 7, 2018. There is no issue before us whether the warrant was properly issued pursuant to statutory authority.

information specifying the corresponding unique device ID, timestamp, coordinates, display radius, and data source, if available (the 'Anonymized List')[.]" Police were then to "analyze this location data to identify users who may have witnessed or participated" in the capital offense and "seek any additional information regarding these devices from Google."

In Step Two, the warrant provided that, "[f]or those accounts identified as relevant to the ongoing investigation through analysis of" the Anonymized List, Google "shall provide additional location history outside of the predefined area for those relevant accounts to determine path of travel." It then specified that, "[t]his additional location history shall not exceed 60 minutes plus or minus the first and last timestamp associated with the account in the initial dataset." This step was intended to aid the police in ruling out any devices flagged by the Anonymized List so that the identity of obvious non-witnesses and non-participants would not be revealed.

Finally, in Step Three, the warrant ordered that, "[f]or those accounts identified as relevant to the ongoing investigation through an analysis of provided records, and upon demand," Google "shall provide the subscriber's information for those relevant accounts to include, subscriber's name, email address, services subscribed to, last 6 months of IP history, SMS account number, and registration IP."[4] In other

---

[4] Courts that have addressed geofence warrants refer to these "Step Three" records simply as *identifying information. See, e.g., United States v. Smith*, 110 F.4th 817, 825 (5th Cir. 2024) (emphasis added) ("[A]t Step 3, law enforcement compels Google to provide *account-identifying information*[.]"; *United States v Chatrie*, 107 F.4th 319, 324 (4th Cir. 2024), *reh'g granted en banc*, 2024 WL 4648102 (4th Cir. Nov. 1, 2024) (emphasis added) ("[A]t Step

words, only in the last step was sufficient information revealed permitting law enforcement to identify witnesses to, or participants in, the capital offense under investigation. At no point during this three-step process were police required to return to the magistrate for incremental authorization.

## B. The Warrant Affidavit

The warrant affidavit started out by providing the "Initial Search Parameters": a "[g]eographical area identified as a polygon defined by" four "latitude/longitude coordinates and connected by straight lines[,]" as specified.[5] The affidavit sought "GPS, WiFi or Bluetooth sourced location history data from devices that reported a location" within the

---

Three, law enforcement determines which individuals are relevant to the investigation and then compels Google to provide their *account-identifying information*[.]"); *Price v. Superior Court of Riverside County*, 93 Cal.App.5th 13, 22, 310 Cal.Rptr.3d 520, 529 (2023) (emphasis added) ("Geofence warrants allow law enforcement agencies to identify suspects and witnesses to crimes by obtaining location data and *identifying information*[.]"). Judge Newell worries that the warrant may have gone too far to authorize a search of Appellant's IP history. Concurring and Dissenting Opinion at 2, 11−12, 20. There is no suggestion in the record that police actually obtained Appellant's IP history pursuant to this warrant. *See Jones v. State*, ___ S.E.2d ___, No. S24A1085, 2025 WL 676862, at *8 n.5 (Ga. del. Mar. 4, 2025) ("[E]ven if the warrant's broader description of items to be seized might raise concerns about particularity, it would not invalidate the warrant here, because the police neither obtained nor used any evidence beyond what was needed to identify Jones."). In any event, to the extent that the information provided at Step Three in this case may suggest access to anything other than *identifying information*, that argument has not been raised in either the court of appeals or this Court, and we will not address it.

[5] Both the affidavit and the warrant itself, besides providing a verbal description of the area included within the geofence, also incorporated a graphic representation of the polygon, which the court of appeals reproduced in its opinion. *Wells*, 675 S.W.3d at 822.

described polygon at a window of time within which the capital murder occurred, namely: "June 24, 2018 0245 hrs (2:45 a.m.) to June 24, 2018 0310 hrs (3:10 a.m.) Central Time Zone[.]" Thus, the affidavit sought location history data for an area that encompassed no more than a part of the church and the church grounds, including the parking lot where the assailants waited, a small segment of Veterans Drive between the church and the house at 4923 Veterans Drive, and the house itself, including front and back yards, for a twenty-five minute interval corresponding to the approximate time of the offense.

In a portion of the warrant affidavit explaining "Google Location Services and Relevant Technology[,]" the affiant, Detective Jeffrey Loeb, explained:

> Google has developed an operating system for mobile devices, including cellular phones, known as Android, that has a proprietary operating system. Nearly every cellular phone using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device. Based on my training and experience, I have learned that Google collects and retains location data from Android-enabled mobile devices when a Google account user has enabled Google location services. Google can also collect location data from non-Android devices if the device is registered to a Google account and the user has location services enabled. The company uses this information for location-based advertising and location-based search results. This location information is derived from GPS data, cell site/cell tower information, and Wi-Fi access points.

In a portion of the affidavit styled "Probable Cause Statement[,]" Loeb next narrated the facts of the offense essentially as described above,

concluding with the assertion that:

> [i]t is likely that at least one of the four suspects who committed this offense had an Android device on him during the commission of this offense. It is common practice that home invasion robbery suspects keep an open line with someone outside of the residence while committing this type of offense to keep an eye out for responding police officers.

Loeb also averred that he was:

> also familiar with Android based cellular devices reporting detailed location information to Google where the electronic data is then stored. This information is captured and recorded even when the user is not doing any specific action on the device. As a result, Affiant is requesting a list of any Google devices in a geographic area around the address of 4923 Veterans Drive, Dallas, Texas 75241 in Dallas County, Texas to help identify the suspects in this capital murder investigation.

The warrant affidavit concluded with a description of the three-step process by which Google releases information in response to geofence warrants, as depicted in the warrant itself and as described above.

### C. Execution of the Warrant

The warrant was signed by a district court judge on December 7, 2018.[6] Pursuant to Step One of the procedure, as outlined in both the warrant and the warrant affidavit, Google identified three devices within the geofence. Once the search was expanded via Step Two, Leob

---

[6] As "Grounds for Issuance[,]" the warrant affidavit cited Articles 18.02(10) (evidentiary search warrants) and 18.02(13) (electronic customer data held in electronic storage) of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. arts. 18.02(10), 18.02(13). Former Article 18.21, Section 5A(b), authorized only district court judges to issue the latter type of warrant.

was able to determine that one of those three devices belonged to an individual who was involved in the offense. Step Three revealed that Appellant was that individual. From there, by separate warrants, Loeb was able to obtain Appellant's Google account information plus additional cell phone records to confirm his presence at the crime scene.

### D. In the Trial Court

Appellant filed a pretrial motion to suppress evidence obtained pursuant to the geofence warrant. He argued that it constituted an unconstitutional general warrant in that it failed to identify a particular suspect and would thus only serve to invade the privacy of any number of individuals who had nothing to do with the capital murder in this case.[7] He also argued that the warrant affidavit lacked probable cause to believe any of the assailants were carrying a cell phone with a Google account.[8]

---

[7] At a hearing on the motion to suppress, counsel for Appellant argued:

The geofence warrant in this case did not identify [Appellant] in any way. In fact, it did not identify anyone. Instead, the warrant operated in reverse. It required Google to identify a large cache of deeply private data and then allowed police the discretion to sift through it and obtain private information from devices of interest. * * * The process effectively filtered out the innocent through increasing levels of searches. But such a process illustrates that the searchers themselves knew that they were searching the innocent merely because they walked or drove through an area in which a crime was committed.

[8] At the hearing, counsel for Appellant maintained:

[I]t is not enough to submit an affidavit stating that probable cause exists for a geofence warrant because, given broad cell phone useage [sic], it is likely the criminal suspect had a cell

The State responded that, under the circumstances in this case, the Initial Search Parameters were so narrow that "every single device operating in th[e] area," would have to have been possessed by "either a suspect or a witness." The prosecutor argued that the geofence warrant was "specifically limited in order to maximize the possibility of returning evidence of a crime and minimize the possibility of intrusion on innocent people." The trial court ultimately ruled that the warrant affidavit and the warrant itself presented "sufficient particularity to be valid."

### E. In the Court of Appeals

After canvassing the limited authorities (mostly federal cases) that have addressed geofence warrants, the court of appeals concluded:

> The geofence warrant cases to date can generally be divided into two categories—those in which the geofence search warrant was found constitutionally infirm because it was not sufficiently limited as to time and place so as to restrict the executing officer's discretion and minimize the danger of searching uninvolved persons, and those in which the warrant satisfied the Fourth Amendment because it established probable cause to search every person found within the geofence area.

*Wells*, 675 S.W.3d at 826−27. Because "the geofence warrant [in this case] was as narrowly tailored as possible to capture only location data for suspects and potential witnesses[,]" the court of appeals concluded that "the warrant here falls into the second category" as identified in the cases. *Id.*

Addressing Appellant's argument that the warrant affidavit

---

phone. If this were the standard, a geofence warrant could issue at almost any criminal investigation where a suspect is unidentified.

failed to establish probable cause to believe that any of the suspects were carrying a device with enabled Google location services, the court of appeals invoked the well-known ubiquity of cell phones in modern society. *Id.* at 826. The court of appeals observed that, "[a]lthough it is possible the suspects were not carrying cell phones with enabled Google location services during the offense, probable cause is about 'fair probabilities,' not near certainties." *Id.* We agree.

### III. APPLICABLE LAW

### A. Probable Cause and Particularity

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. As the court of appeals did, *Wells*, 675 S.W.3d at 827, we will assume (without deciding) that for law enforcement to obtain Google cell phone location history data for a particular area at a particular time constitutes a "search" within the parameters of the Fourth Amendment.[9]

---

[9] The Fourth Circuit Court of Appeals and the Fifth Circuit Court of Appeals have recently disagreed on the question of whether the Government's acquisition of location history data by way of a geofence warrant constitutes a "search" for Fourth Amendment purposes. *Compare Chatrie*, 107 F.4th at 332 (applying the third party doctrine to hold that it does *not* constitute a search), *with Smith*, 110 F.4th at 836 (holding that the third party doctrine does *not* apply to geofence warrants and concluding that "law enforcement in this case *did* conduct a search when it sought Location History data from Google"); Pierre Grosdidier, *Courts Are Split: A Look at the Constitutionality of Geofence Warrants*, 87 TEX. B.J. 776 (Nov. 2024). The court of appeals in this case found

The United States Supreme Court has said that, generally, when law enforcement officers undertake a search for evidence of criminality, before that search may be deemed "reasonable" under the Fourth Amendment, they must first obtain a warrant. *Carpenter v. United States*, 585 U.S. 296, 316 (2018). Here, a warrant *was* obtained. The search pursuant to the geofence warrant was therefore reasonable so long as the warrant affidavit supplied probable cause to justify the search, and the warrant itself set out the place to be searched and the things to be seized with sufficient particularity to avoid granting the officers unguided discretion in conducting the search. *Dalia v. United States*, 441 U.S. 238, 255 (1979); *Steagald v. United States*, 451 U.S. 204, 220 (1981). *See Bonds v. State*, 403 S.W.3d 867, 874–75 (Tex. Crim. App. 2013) (listing "limiting the officer's discretion and narrowing the scope

---

it unnecessary to address this question. *Wells*, 675 S.W.3d at 827. In *Price v. Superior Court of Riverside County*, a case upon which the court of appeals relied heavily, the intermediate California appellate court likewise "assumed for purposes of discussion . . . that the search for location data and identifying information, as authorized by the geofence warrant, constituted a 'search' within the meaning of the Fourth Amendment." 93 Cal.App.5th at 37 n.9, 310 Cal.Rptr.3d at 541 n.9. We will too.

Judge Newell contends that the court of appeals in this case "erred" not to reach the threshold question of whether there was even a search for Fourth Amendment purposes. Concurring and Dissenting Opinion at 4 & n.5, 19. Even if this Court were to find that the court of appeals erred in its probable cause analysis, however, that would not mean it erred in failing to reach the threshold "reasonable expectation of privacy" question. *See Byrd v. United States*, 584 U.S. 395, 411 (2018) ("Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim."); *Jones*, 2025 WL 676862, at *3 n.1. It would just mean that it would be necessary to remand the case to that court, which is what Judge Newell advocates anyway. Concurring and Dissenting Opinion at 19.

of the search" and "minimizing the danger of searching the person or property of an innocent bystander or property owner" as among the objectives of the particularity requirement).

### B. The Cases Addressing Geofence Warrants

Geofence warrants are a relatively new phenomenon, having only come into use "since 2016[.]" Note, *Geofence Warrants and the Fourth Amendment*, 134 HARV. L. REV. 2508, 2509−10 (May 2021). The few cases so far that have addressed their legitimacy have tended to emanate from lower federal courts and intermediate state appellate courts. And, as the court of appeals observed, those cases "can generally be divided into two categories[.]" *Wells*, 675 S.W.3d at 826−27.

Which category a given case falls into depends upon the size of the area covered by the requested geofence, the length of time specified, and the circumstances of the offense under investigation. Geofence warrants that are confined, covering a relatively small space over a relatively short time, in a remote or rural area, or at a time of day when only the perpetrators of the offense or witnesses would be likely to be present, have generally been found to pass constitutional muster.[10] But

---

[10] *See, e.g.*, *In re Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation ("Arson")*, 497 F.Supp.3d 345, 358 (N.D. Ill. 2020) ("Streets in the wee hours of the morning in the City of Chicago are generally sparsely populated by pedestrians, and roads have few cars traversing through them. Furthermore, the affiant has provided additional information obtained through the investigation to support the conclusion that location data from uninvolved individuals will be minimized."); *In re Search of Information that is Stored at Premises Controlled by Google LLC*, 579 F.Supp.3d 62, 85−86 (D.D.C. 2021) ("[T]he geofence drawn here is located in an industrial area, not a 'congested urban area,' and no residences can be seen [within it, and] the target area is small and lightly trafficked enough to render the search reasonable."); *In re Search of Information that is Stored at Premises Controlled by Google*, No. 2:22-mj-01325, 2023 WL 2236493,

warrants that cover larger or more congested urban areas over a longer span of time generally have *not*, since they are much more likely to

at *12 (S.D. Tex. Feb. 14, 2023) ("The timing of the request indicates narrow tailoring to avoid collection of data at times when uninvolved devices, and the people possessing them, would likely be within the polygon. * * * The polygon itself is also narrowly tailored to ensure that Location History information, with a fair probability, will capture evidence of the crimes only."); *Price*, 93 Cal.App.5th at 43−44, 310 Cal.Rptr.3d at 546 ("The target location was limited to the front yard . . . where the shooting occurred, and the street in front of the house, for the length of two houses in each direction, where the two suspects were seen fleeing after the shooting. * * * Additionally, because the warrant sought first-stage location data after 10:00 p.m. in a suburban, residential neighborhood, it was likely that any individuals traversing the geofence were either suspects or witnesses to the shooting."); *Tomanek v. State*, 261 Md.App. 694, 715, 314 A.3d 750, 762 (2024) ("[B]y limiting the search area to within a 100-meter radius of the main residence [of a rural homestead], the police virtually ensured that any cell phone activity that met the [geofence] search's parameters would have had to come from within the property's boundaries. Given that the property was privately owned and included 'no trespassing' signs, and given that the property owner had claimed no family member had been to the property between April 4 and April 11, 2020, the chance that the search would result in any unauthorized or unnecessary invasion of privacy was almost non-existent."); *State v. Contreras-Sanchez*, 5 N.W.3d 151, 168 (Minn. Ct. App. 2024), *rev. granted* (May 29, 2024) ("The geofence did not include any buildings at all. The closest residence was over 1,200 feet away. And due to the remoteness of the area, the warrant's inclusion of a scarcely used road did not risk pulling in vast swaths of location-history data from drivers who just happened to be passing through this rural area."); *Jones*, 2025 WL 676862, at *7 ("[T]he time range matched the approximate time period when the suspect was seen at and around the [murder] victim's home, and the geographic range was reasonably targeted to capture the suspect's movements, especially given that Google location history is not precise."); *see also*, 2 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.6(d), at 35−37 (6th ed. 2020) (Supp. 2024) (discussing *Arson* and *Price* approvingly); Mary D. Fan, *Big Data Searches and the Future of Criminal Procedure*, 102 TEX. L. REV. 877, 886 (April 2024) ("[D]igital probable cause and particularity can be established by a tightly framed . . . geofence warrant likely only to net persons for whom there is probable cause to believe perpetrated an unsolved crime.").

infringe upon a greater number of innocent, uninvolved bystanders.[11] Indeed, the issue is often not so much whether there is probable cause to believe the search will uncover evidence of the offense as it is whether the warrant is "overbroad"—that is, whether the search it authorizes outstrips the probable cause that justifies it by casting too wide a net

---

[11] *See, e.g.*, *In re Search of Information Stored at Premises Controlled by Google*, 481 F.Supp.3d 730, 756 (N.D. Ill. 2020) (finding the geofence warrant overbroad, while also observing: "It is also possible to imagine other applications of geofence technology that might comport with Fourth Amendment standards. Say, for example, that the government develops information supporting probable cause to believe that its geofences will not capture the information of uninvolved persons, such as a scenario in which the government can establish independently that only the suspected offender(s) would be found in the geofence, or where probable cause to commit an offense could be found as to all present there."); *In re Search of Information that is Stored at Premises Controlled by Google, LLC*, 542 F.Supp.3d 1153, 1158 (D. Kan. 2021) ("[T]he geofence boundary appears to potentially include the data for cell phone users having nothing to do with the alleged criminal activity. The boundary encompasses two public streets, so anyone driving their automobile by the target location during the relevant time period could be identified in the data. Google Maps also indicates that the subject building contains another business, which the application does not address.  * * *  And the nexus between the alleged criminal activity and [the] one-hour duration [of the requested temporal scope of the search] is weak."); *People v. Meza*, 90 Cal.App.5th 520, 312 Cal.Rptr.3d 1, 18−19 (2023) ("The failure to sufficiently narrow the search parameters potentially allowed a location-specific identification of thousands of individuals . . . for whom no probable cause existed.  * * *  The warrant here, authorizing the search of more than 20 acres total over a cumulative period of more than five hours in residential and commercial areas did not meet the fundamental threshold requirement [of particularity]."); *see also*, *In re Search of: Information Stored at Premises Controlled by Google, as Further Described in Attachment A*, No. 20 M 297, 2020 WL 5491763, at \*7 (N.D. Ill. July 8, 2020) (finding the geofence warrant overbroad, but observing that, "if the government had constrained the geographic size of the geofence and limited the cellular telephone numbers for which agents could seek additional information to those numbers that appear in all three defined geofences, the government would have solved the issues of overbreadth and lack of particularity").

and thereby impacting an unacceptable number of people who cannot possibly have any connection to the offense.[12]

## IV. ANALYSIS

In this case, the geofence warrant affidavit supplied ample probable cause to believe both that an offense had occurred and that evidence of the identity of one or more of the perpetrators could be discovered by searching the Google database. Moreover, the warrant itself was framed narrowly enough that almost any device found to have been present within its parameters would have belonged to one of the perpetrators, or potentially to a witness who might identify the perpetrators or testify about the offense, but not merely an innocent bystander.

### A. Probable Cause

### 1. An Offense Occurred . . .

Probable cause to support a search warrant is present when, under the totality of circumstances, there is at least a "fair probability" or "substantial chance" (it need not be "more likely than not") that

---

[12] *E.g.*, *Meza*, 312 Cal.Rptr.5th at 16, 20 (observing that "the warrant in this case sufficiently described the place to be searched (Google's database of users' location history) and items to be retrieved from that search (designated records for users to be found within the boundaries of certain coordinates at certain times)[,]" while nevertheless concluding that the warrant lacked particularity for failing to be structured so as to minimize the potential for capturing location data for uninvolved individuals and maximize the potential for capturing location data for suspects and witnesses); *United States v. Chatrie*, 590 F.Supp.3d 901, 929−30 (E.D. Va. 2022) ("To be sure, a fair probability may have existed that the Geofence Warrant would generate the *suspect's* location information. However, the warrant, on its face, also swept in unrestricted location data for private citizens who had no reason to incur Government scrutiny.").

evidence of an offense will be found at the location that law enforcement seeks to search. *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 243 n.13 (1983)).[13] There can be little doubt—and Appellant does not contest—that the warrant affidavit established that an offense had occurred, namely, the murder of Giddings. The question is whether there is probable cause— at least a "fair probability" or "substantial chance"—that the thing to be searched—the Google location history database—will contain evidence of that offense. For the following reasons, we agree with the court of appeals that the magistrate who signed off on the warrant affidavit had a "substantial basis" to conclude that probable cause existed to believe that Google's location history database would reveal evidence of who murdered Giddings (if it revealed any information at all). *Id.* (citing *Gates*, 462 U.S. at 238).

## 2. . . . For Which Evidence of the Perpetrator's Identity Could be Found in Google's Location History Database

Detective Loeb's warrant affidavit established that Google's location history database could contain location information for a substantial number of both Android devices as well as non-Android

---

[13] Assuming that the warrant in this case was controlled by Article 18.01(c) of the Texas Code of Criminal Procedure, because it is a so-called "evidentiary" search warrant under Article 18.02(10), it could not have issued absent probable cause as to three things: "(1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched." TEX. CODE CRIM. PROC. arts. 18.01(c), 18.02(10). For reasons we describe in the text, all three statutory criteria are satisfied here.

devices that were registered to Google accounts with enabled location services. Appellant argues, however, that probable cause requires a specific showing that one of the assailants was indeed carrying a device with enabled Google location services. Like the court of appeals, we disagree that probable cause necessarily requires so much. *Wells*, 675 S.W.3d at 826.

Loeb's affidavit claimed that "[i]t is likely that at least one of the four suspects . . . had an Android device on him during the commission of the offense," since home-invasion-type offenses commonly involve "someone outside of the residence . . . to keep an eye out for responding police officers." From this the magistrate could reasonably have inferred a "fair probability" or "substantial chance" that the home invaders carried cell phones to keep contact with an outside lookout.

Moreover, a magistrate is entitled to take it as well-established fact that, in this day and age, almost everyone possesses a cell phone on or about his person at practically any time of day or night—they are, indeed, ubiquitous. *See Carpenter*, 585 U.S. at 311 (noting that people "compulsively carry cell phones with them at all times"); *Riley v. California*, 573 U.S. 373, 385 (2014) (noting that cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy"). "The core inquiry here is probability, not certainty, and it is eminently reasonable to assume that criminals, like the rest of society, possess and use cell phones to go about their daily business." *In re Search of Information that is Stored at Premises Controlled by Google*

*LLC*, 579 F.Supp.3d 62, 78 (D.D.C. 2021).[14]

In this case, the warrant-issuing magistrate had a "substantial basis" to conclude that there was a "fair probability" (or "substantial chance") that at least one of the four assailants possessed a device that Google could locate within the geofenced area.[15] This constitutes probable cause to believe that Google's location history database would contain evidence relevant to the identity of the person who killed Giddings.

---

[14] In *State v. Baldwin*, 664 S.W.3d 122, 123 (Tex. Crim. App. 2022), this Court concluded that, in order to conduct a search of the *content* of a suspect's cell phone, law enforcement must be able to demonstrate probable cause in the form of a "nexus" between the cell phone and the commission of the offense itself. The Court later concluded that probable cause can be established that the contents of a cell phone might contain evidence of a crime without necessarily showing that the cell phone was directly *used* in the commission of the offense. *Stocker v. State*, 693 S.W.3d 385, 388 (Tex. Crim. App. 2024). In any event, in the instant case, mere *possession* of the cell phone at the time and location of the offense may well be enough—never mind what is contained *in* the cell phone—to constitute evidence of the identity of the perpetrator of, or witnesses to, the offense.

[15] One legal commentator has observed that, at least as of 2022:

> [S]tatistics demonstrate a fair probability that Google will have location data on the target of a geofence query. Eighty-five percent of Americans own a smartphone, and Google enjoys a 40% domestic market share (compared to 60% for Apple). This means that 34% of Americans own an Android smartphone while 51% own in iPhone. If Google has location data on almost all Android users (30%) and half of iPhone users (25%), then Google has location information on 55% of Americans, meeting the preponderance standard, and thus by definition satisfying the lower probable cause test.

Reed Sawyers, *For Geofences: An Originalist Approach to the Fourth Amendment*, 29 GEO. MASON L. REV. 787, 807−08 (2022) (internal footnotes omitted).

### B. Particularity

We also agree that the geofence warrant in this case provided sufficient particularity with respect to both the "place to be searched" and the "things to be seized." U.S. CONST. amend. IV. The "place" designated by the warrant to be searched, which was directed to "Google LLC," was wherever Google stores its "[r]ecords pertaining to GPS, WiFi or Bluetooth sourced location history data[.]" The "thing to be seized" was the "location history data generated from devices that reported a location within the geographical region bounded by the following latitudinal and longitudinal coordinates, dates and times ("Initial Search Parameters") and Identifying information for Google Accounts associated with the responsive location history data[.]"

The warrant then identified the specific latitudinal and longitudinal coordinates, narrowly drawn to include no more than a part of the church, the appurtenant church grounds where the assailants waited, the street they rushed across, the front yard of the house where Dickerson was shot, and the house itself, in which Giddings was killed. It also gave a specific date—the date of the murder—as well as the 25-minute window of time during which the offense took place. This degree of specificity appropriately circumscribed police discretion, limiting the information they could obtain from the location history database to that which was relevant to identifying whoever was present at the specific time and place of the offense itself.

Moreover, the "Initial Search Parameters" were sufficiently tailored in terms of time and place as to minimize the potential for infringing on the privacy rights of persons who could not reasonably be

regarded as either suspects or witnesses to the offense. The area to be searched was small and restricted to the places where police knew that the unidentified suspects were located: a part of the church grounds, where the suspects hid in waiting for Giddings to arrive home; the street between the church and the home, which the suspects rushed across; and the front yard and interior of the house itself, where the assaults on Dickerson and Giddings took place. These were not high traffic areas—especially not during the brief period of time in the middle of the night when the offense occurred.[16] It was not at all likely that the geofence in this case would have identified many innocent bystanders or passersby who would not have been relevant to the investigation.

Indeed, the "Initial Search Parameters" were so narrow in this case as to allay any concern about Steps Two and Three of the warrant process, as described in both the warrant and the warrant affidavit. Appellant argues that, even if there was probable cause to support Step One of the processes authorized by the geofence warrant in this case, police should have been required to involve the magistrate in deciding which devices identified by Step One merited additional disclosure from the location history database, via Steps Two and Three. Otherwise, Appellant asserts, the warrant allowed police improper unilateral

---

[16] The geofence polygon also embraced part of the interior of the church, and the back yard to the house—places the police would have no reason to believe the suspects had gone. But there is no reason to believe uninvolved persons would have been found in those two places either, at least not between 2:45 and 3:10 o'clock in the morning—even, as here, on a Sunday morning. Moreover, anyone who may, for whatever reason, have been present at those locations at that time would likely at least have heard gunshots, and therefore would at least have been potential witnesses to the offense.

discretion to determine whether there is probable cause to justify that additional disclosure, contrary to Fourth Amendment principles.

But while some geofence warrants may be so broad in scope at Step One as to call for additional involvement by a magistrate at the later stages, we do not believe that to be the case here. The Initial Search Parameters in this case were sufficiently narrow as to provide probable cause, under the circumstances, to believe that *whichever* devices were revealed to have been present at the narrowly circumscribed place and time captured by the geofence polygon would almost certainly have belonged to legitimate suspects, or potential witnesses, so that any additional disclosure of information via Steps Two and Three would be justified by the same probable cause that supported Step One. *See Price v. Superior Court of Riverside County*, 93 Cal.App.5th 13, 44–45, 310 Cal.Rptr.3d 520, 546–47 (2023) (concluding that, when the warrant affidavit supplied probable cause "to seize all location data and identifying information for all devices traversing the geofence[,]" additional disclosure in Step Two did not improperly vest police with unguided discretion). On the specific facts of this case, we do not deem the geofence search warrant to have been so lacking in particularity as to require an additional magisterial imprimatur in the later stages of its execution.

## V. CONCLUSION

Assuming that the Fourth Amendment generally requires police to obtain a search warrant for corporate-held location history data, we conclude that the geofence warrant in this case was supported by probable cause and that it satisfied the particularity requirement of the

Fourth Amendment. The judgment of the court of appeals is affirmed.[17]

**FILED:**                                                      April 2, 2025
**PUBLISH**

---

[17] We also granted a second ground for review in this case: "[w]hether the Court of Appeals correctly determined the reliability of Google data[.]" But we now dismiss that ground as improvidently granted.
.